UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

CRIMINAL NO. 07-53-KKC

| | |
|---|---|
| UNITED STATES OF AMERICA | PLAINTIFF |
| | |
| VS: | RECOMMENDED DISPOSITION OF MOTION TO SUPPRESS |
| | |
| GILBERT TIMOTHY ALLEN | DEFENDANT |

\* \* \* \* \*

Defendant Gilbert Timothy Allen moves to suppress evidence in this action. *See* DE# 12. The indictment alleges six violations of 18 U.S.C. § 922(g)(3), which prohibits firearm possession by an unlawful user of controlled substances, and two violations of § 922(a)(6), which proscribes knowingly providing false statements to a licensed firearm dealer.[1] *See* DE# 1 (Indictment, Counts 1-8). Defendant's motion seeks to suppress statements relative to Allen's drug use and firearm possession. He provided the statements at a December 22, 2006 traffic stop and in an April 27, 2007 interview with ATF agents. In both instances, Defendant claims that authorities failed to comply with *Miranda v. Arizona*, 86 S.Ct. 1602 (1966).

The United States perceives no *Miranda* violation. *See* DE# 15 (Response). Regarding the December 22 traffic stop, the United States argues that "Defendant's statements were made either before the Defendant was in custody or after the Defendant had been advised of, and waived, his

---

[1] The indictment also includes a final count directing forfeiture of the firearms supporting the §§ 922(g)(3) and 922(a)(6) charges. *See* DE# 1 (Indictment, Count 9).

*Miranda* rights." *See id*. at 1.  The Government submits that Defendant also was not in custody, meriting no *Miranda* advice,  when he provided the April 27 statements.  *See id*. at 2.

The Court conducted a full evidentiary hearing on July 26, 2007 to explore the *Miranda* issue.  *See* DE# 26.  After permitting and receiving supplemental briefs, the matter stands ripe for review.  *See* DE## 33 & 34.  For the reasons provided below, the Court recommends that the District Court DENY Defendant's motion to suppress.

## I. Relevant Facts

Kentucky Vehicle Enforcement Officer Charles Garland initiated the December 22, 2006 traffic stop.  Garland encountered Defendant's vehicle on U.S. 25 in Laurel County.  *See* DE# 28 Hearing at 7.  According to Garland's testimony, he observed Allen's vehicle repeatedly cross the centerline, and he also believed that Defendant's car lacked a muffler.  *See id*. at 8.  Garland stopped Defendant's vehicle at approximately 2:50 p.m due to the witnessed traffic violations.  *See id*. at 8, 11.

Immediately after the stop, Officer Garland approached Defendant's car to discuss the violations.  *See id*. at 8.  Garland suspected that Defendant was impaired, based on the encounter. He noticed that Allen "had slurred speech" and "constricted pupils," which Garland explained as consistent with impairment.  *See id*.  Garland thus determined to investigate whether Defendant had been driving under the influence.  *See id*. at 8, 10.

He instructed Defendant to exit the vehicle and step to the rear of the car.  There, Garland asked Defendant about the suspected drug use.  *See id*. at 9.  Allen replied that "he'd snorted pain medication, prescription pain medication, and that he'd also smoked methamphetamine."  *Id*. Garland next administered two field sobriety tests, which Defendant allegedly failed.  *See id*. at 9-10,

23. Following the sobriety tests, Garland asked Defendant whether he had any drugs or weapons in the vehicle or on his person. Defendant answered "no." *See id*. at 10.

At that point, Garland formally placed Allen under arrest for DUI. *See id*. at 11. He searched Defendant and found one round of ammunition in Defendant's pocket. *See id*. at 12. Garland handcuffed Defendant and placed him in the backseat of the police cruiser. *See id*. at 11, 17. Prior to that time, Garland did not consider Allen as under arrest. *See id*. at 8-9.

Garland next searched the vehicle. *See id*. at 11. He located drug paraphernalia and a loaded pistol between the console and the driver's seat.[2] *See id*. at 11-12, 17-18. The paraphernalia appeared to have drug residue on it. *See id*. Garland also testified that the ammunition on Defendant's person was consistent with the firearm located in the car. *See id*. at 12. After the vehicle search, Garland testified that he returned to the police cruiser, read Defendant his *Miranda* rights, and asked Defendant about the weapon and the substance on the drug paraphernalia. *See id*. at 12-13; *see also id*. at 23-24. Garland did not secure a written *Miranda* waiver, but he testified that Allen voluntarily agreed to talk to him. *See id*. at 13, 19, 24.

According to Garland, Defendant initially denied knowledge and ownership of the firearm and drug paraphernalia. *See id*. at 12, 19-20. Allen explained that the gun belonged to his girlfriend. *See id*. at 12. Garland, however, continued to talk to Defendant for "a few more minutes." *See id*. In the discussion that followed, Defendant "finally" admitted that he had used the gun and that he knew that the weapon was in the car. *See id*. Defendant also admitted that the drug paraphernalia

---

[2] According to Officer Garland's testimony, he first noticed "what appeared to be the butt of a pistol" when Defendant exited the car. *See* Hearing at 10; *see also id*. at 15-16. However, Garland did not immediately secure the weapon or question Defendant about the gun. *See id*. at 16-17. Because Defendant went with Officer Garland to the rear of the car and because there were no passengers, Garland explained that the unsecured weapon posed no danger. *See id*.

3

belonged to him, and he explained that "he was trying to quit." *See id*. Officer Garland testified that the stop lasted approximately twenty minutes, in total. *See id*. at 11.

Defendant evidently pled guilty to state drug charges as a result of the December 22 traffic stop. Although the drug charges might have disqualified Defendant from lawfully possessing a firearm under federal law, Defendant purportedly acquired a handgun from a federal firearms licensee despite the state drug conviction. *See* 18 U.S.C. § 922(g)(3); DE #28, Hearing at 27-28. The FBI system that monitors such transactions (commonly referred to as "NICS") actually denied the transfer, but notice of the denial followed the physical transfer. *See id.* at 27-29; *see also* 18 U.S.C. § 922(s)(1)(A)(ii)(permitting licensed firearm dealer to transfer handgun after five business days have elapsed without receiving notice of denial from law enforcement). As a result, the firearm dealer legitimately conveyed the handgun to Defendant. *See* Hearing at 27-29. The FBI referred the matter to the ATF. *See id*.

ATF Agents Thomas Chittum and Brad Brasher investigated the firearm issue. *See id*. at 27, 32. At the evidentiary hearing, Agent Chittum confirmed that the drug charges from the December 22 traffic stop had in fact prompted the NICS system to deny the weapon transfer. *See id*. at 29. Chittum, Brasher, and a Laurel County deputy sheriff visited Defendant's residence on April 27, 2007 to investigate. *See id*. at 29-30, 32.

Chittum testified that he interviewed Allen on the front steps to Defendant's residence. *See id*. at 30. According to Chittum, he explained the basis for the interview and asked Defendant whether he had possession of the subject firearm. Allen answered that he had re-pawned the weapon to the original dealer. *See id*. Chittum next discussed the state drug and firearm charges from the December 22 traffic stop. Defendant denied owning the drug paraphernalia or the firearm involved

4

in the stop. *See id*. at 30-31, 40. Chittum explained to Defendant that he had pled guilty to the charges, but Allen replied that he did so only on his attorney's advice. *See id*. at 31.

Chittum additionally suspected that methamphetamine had been manufactured on Defendant's property because during the visit Chittum observed, among other things, a corroded propane tank and batteries. *See id*. Allen denied any meth involvement. *See id*. Chittum then requested consent to search the property. Defendant refused and instructed Chittum to obtain a warrant. *See id*. at 31-32.

At that point, Chittum testified that he briefly stepped away from the interview and made a phone call to determine whether he could secure a search warrant. *See id*. at 32. Agent Brasher, however, continued to speak with Defendant. *See id*. After only a "couple of minutes," Brasher signaled for Chittum to return. *See id*. at 33-34. Brasher reported to Chittum that Defendant "had changed his mind and agreed to consent to a search of the residence." *See id*. at 33. Allen himself confirmed to Chittum that he had in fact consented to the search. *See id*. at 33-34.

Brasher additionally informed Chittum that Defendant had admitted to prior methamphetamine addiction and use. *See id*. at 33-34. Because he was on the phone and had stepped away from the interview, Chittum did not hear the statements firsthand, and there is no indication that Defendant repeated the admissions to Chittum. *See id*. at 33. Brasher himself did not testify at the hearing.

After Defendant consented, the officers started to search the residence. *See id*. at 34. Allen revoked his consent approximately five minutes later. *See id*. at 35. It appears that the interrupted

5

search yielded no contraband or evidence. According to Chittum, the April 27 interview and search lasted twenty to thirty minutes in total. *See id.* at 34, 36.

Chittum testified that the officers did not read Defendant his *Miranda* rights at the April 27 encounter. *See id.* at 35. Instead, Chittum explained that Allen was not, at any point, in custody. *See id.* According to Chittum, the officers never placed restrictions on Defendant's ability to move and never told Defendant that he could not leave. *See id.* at 35-36. In fact, Chittum stated that Allen, on at least one occasion during the interview, volitionally went into his residence unaccompanied and closed the door. *See id.*

It appears that Defendant was on house arrest on April 27, 2007 as a result of the December 22 state charges and conviction. *See id.* at 38-41. Chittum testified that he was unaware of Defendant's home incarceration status at the time of the interview and search. *See id.*

## II. Analysis

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend V. In addition to criminal proceedings, the privilege against self-incrimination extends to persons in custody and subject to police interrogation. *See Miranda v. Arizona*, 86 S.Ct. 1602, 1624 (1966). According to the Supreme Court, custodial interrogation is inherently coercive, and to protect Fifth and Sixth Amendment privileges in that circumstance, the police must advise the suspect of his constitutional rights. *See id.* at 1612, 1619, 1624, 1630. Absent compliance with this safeguard, incriminating statements elicited from a suspect in custody are inadmissable. *See id.* at 1630.

Following valid *Miranda* warnings, a suspect may waive his rights and agree to answer questions or make a statement. *See id.* An effective *Miranda* waiver must be voluntary, knowing,

and intelligent, under a totality of the circumstances. *See Moran v. Burbine*, 106 S.Ct. 1135, 1140-41 (1986). The *Miranda* waiver analysis has two distinct dimensions. *See id.* at 1141. First, the "relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id.* Second, "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* The Government bears the burden of proving a valid waiver by "a preponderance of the evidence." *See Colorado v. Connelly*, 107 S. Ct. 515, 522 (1986); *see also Missouri v. Seibert,* 124 S. Ct. 2601, 2608 n. 1 (2004).

In this case, Allen claims that he was in custody when authorities elicited the December 22 and April 27 statements. *See* DE# 12 at 1. A defendant seeking to suppress based on *Miranda* bears the burden of establishing that *Miranda's* obligations apply. *See United States v. Donaldson,* 2006 WL 4632512, at *4 (S.D. Ohio June 27, 2006)("[W]hen a defendant seeks to suppress his statements on the basis that he was not given *Miranda* warnings, he has the burden of proving by the preponderance of the evidence that he was entitled to those warnings, because he was subjected to a custodial interrogation."). If Defendant establishes custody, the United States must show that, prior to Allen's statements, authorities advised Defendant of his rights and secured a valid *Miranda* waiver. The Court considers each incident below.

*December 22, 2006 Statements*

A.

In brief, Officer Garland suspected that Allen was impaired after he approached Defendant's vehicle to discuss the traffic violations. *See* Hearing at 8. Garland thus determined to investigate whether Defendant had been driving under the influence. *See id.* at 8, 10. He instructed Defendant

7

to exit the vehicle and move to the rear of the car. There, Garland questioned Defendant about the suspected drug use. *See id*. at 9. Allen, unadvised of his *Miranda* rights, answered that "he'd snorted pain medication, prescription pain medication, and that he'd also smoked methamphetamine." *See id*.

Officer Garland subsequently arrested Defendant and placed him in Garland's cruiser. Garland then searched Allen's vehicle. *See id*. at 11. In the course of the search, he discovered a firearm and drug paraphernalia. *See id*. at 11-12, 17-18. According to Garland, he returned to the cruiser, read Defendant his *Miranda* rights, and asked Defendant about the contraband located in the vehicle. *See id*. at 12-13; *see also id*. at 23-24. Officer Garland did not secure a written *Miranda* waiver. *See id*. at 19, 24. Defendant then made incriminating statements as to both the firearm and the drug paraphernalia, although he initially denied ownership and knowledge of each. *See id*. at 12, 19-20.

B.

Defendant plainly provided incriminating statements prior to any *Miranda* advice. The United States argues that the statements are nonetheless admissible because Defendant was not in custody at that time. Custody, as the Government contends, is an essential predicate to *Miranda*. *See Oregon v. Mathiason*, 97 S.Ct. 711, 714 (1977)("*Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.'").

Regarding the custody element, the Supreme Court explains that "the ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *See California v. Beheler*, 103 S.Ct. 3517, 3520 (1983)(citations omitted); *see also Mathiason*, 97 S.Ct. at 713 (explaining that a custodial interrogation occurs where a "person

8

has been taken into custody or otherwise deprived of his freedom of action in any significant way")(citations omitted). Relying on the Supreme Court's formulation in *Berkemer v. McCarty*, 104 S.Ct. 3138, 3151 (1984), the Sixth Circuit considers "how a reasonable man in the suspect's position would have understood the situation" under a totality of the circumstances. *See United States v. Swanson*, 341 F.3d 524, 528-29 (6th Cir. 2003); *United States v. Salvo*, 133 F.3d 943, 948 (6th Cir. 1998). Relevant factors include: whether a reasonable person in the suspect's position would feel free to leave; the length and purpose of the police questioning; whether the interrogation environment was hostile or coercive; whether officers informed the suspect that the questioning was voluntary or that the suspect was free to leave; and whether the suspect initiated the interview or acquiesced to a request to answer questions. *See Swanson*, 341 F.3d at 529; *Salvo* 133 F.3d at 950.

In this case, Officer Garland stopped Defendant's vehicle after observing the vehicle repeatedly cross the centerline and because he believed the car lacked a muffler. *See* Hearing at 8; KRS § 189.300(1); KRS § 189.140(1)("Every motor vehicle . . . shall be equipped with a suitable and efficient muffler."). The undisputed traffic violations plainly validate the stop. *See Whren v. United States,* 116 S. Ct. 1769, 1772 (1996). The routine traffic stop itself, however, does not constitute custody under *Miranda*. *See Berkemer*, 104 S.Ct. at 3151 ("[W]e reject the contention that the initial stop of respondent's car, by itself, rendered [respondent] 'in custody.'").

In *Berkemer*, the Supreme Court compared traffic stops to the brief investigatory detentions authorized in *Terry v. Ohio*, 88 S.Ct. 1868 (1968). *See Berkemer*, 104 S.Ct. at 3150. Per *Terry*, a police officer, acting without probable cause, may briefly detain a person based on a reasonable suspicion that criminal activity is afoot. *See Smoak v. Hall*, 460 F.3d 768, 778 (6th Cir. 2006). The inquiry that follows the *Terry* stop must be "reasonably related in scope" to the circumstances that

justified the detention. *See Berkemer*, 104 S.Ct. at 3150; *Terry*, 88 S.Ct. at 1884. Thus, the officer may ask a "moderate number of questions" to confirm or dispel the officer's suspicions. *See Berkemer*, 104 S.Ct. at 3150.

The *Berkemer* opinion noted that no Supreme Court decision has applied the "dictates of *Miranda*" to a *Terry*-style detention. *See id*. As with *Terry* stops, the Supreme Court in *Berkemer* ruled that "persons temporarily detained pursuant to [ordinary traffic] stops are not 'in custody' for purposes of *Miranda*." *See id*. The Court finds that Garland's limited additional investigatory activities in this case, which occurred at the rear of Defendant's vehicle, correspond to the *Terry*-style roadside detentions exempted from *Miranda* by *Berkemer*.

According to Garland's testimony, Allen displayed qualities consistent with impairment. *See* Hearing at 8. Namely, Garland noticed that Defendant "had slurred speech" and "constricted pupils." *See id*. On this basis, Garland determined to investigate whether Defendant had been driving under the influence, and he instructed Allen to exit the vehicle. *See id.* at 8-10. Garland promptly directed Defendant to the rear of the car, asked Defendant about the suspected drug use, and administered two field sobriety tests. *See id.* at 9-10.

Admittedly, the purpose of the roadside detention and investigation had moved past the original traffic violations by this juncture. To extend a traffic stop beyond its initial scope, a reasonable suspicion must exist relative to additional criminal activity. *See United States v. Ervin*, 59 Fed. Appx. 631, 635 (6th Cir. 2003); *United States v. Cantu*, 1995 WL 122792, at *3 (6th Cir. Mar. 21, 1995). In this case, the Court finds that Defendant's erratic driving and physical characteristics, *i.e.*, slurred speech and constricted pupils, collectively provided a reasonable suspicion for Garland to further investigate whether Allen was impaired. *See*, *e.g.*, *Rogala v. District of Columbia*, 161

10

F.3d 44, 52 (D.C. Cir. 1998)(finding a defendant who drove through a red light and exhibited glossy eyes and a bloated face justified a field sobriety test under the reasonable suspicion standard). Moreover, Garland's subsequent investigatory steps conformed to the standards and limitations in *Terry* . The question concerning Defendant's drug use and the field sobriety tests were "reasonably related in scope" to confirm or dispel Officer Garland's suspicions. *See Berkemer*, 104 S.Ct. at 3150; *Terry*, 88 S.Ct. at 1884.

Thus, even though Garland temporarily extended the traffic stop and removed Defendant from the vehicle, the stop never exceeded a *Terry*-style detention. In *Berkemer*, the Supreme Court disassociated investigatory roadside detentions of this nature and magnitude from the "dictates of *Miranda*." *See Berkemer*, 104 S.Ct. at 3150.[3]

Furthermore, evaluation of the other custodial factors identified by the Sixth Circuit also indicates that the roadside detention had not ripened into actual "custody" prior to Defendant's formal arrest. Although Defendant was not free to leave the traffic stop, he was not otherwise restrained by handcuffs or cornered by a large number of officers. *See Swanson*, 341 F.3d at 530. By *Miranda* standards, the setting was not hostile or coercive. The traffic stop involved a single officer and occurred in public view on a public highway. *See Berkemer*, 104 S.Ct. at 3151;

---

[3] The factual similarities between this case and *Berkemer* are striking. In *Berkemer*, the officer stopped the defendant after observing the defendant's vehicle weave between lanes. The officer asked the defendant to exit the vehicle at the stop. The officer then performed a field sobriety test and asked the defendant whether he had been using intoxicants. The defendant replied that "he had consumed two beers and had smoked several joints of marijuana a short time before." At that point, the officer formally placed the defendant under arrest. *See Berkemer*, 104 S.Ct. at 3141. On these facts, the *Berkemer* Court found that the defendant had "failed to demonstrate that, at any time between the initial stop and the arrest, he was subjected to restraints comparable to those associated with a formal arrest." *See id.* at 3151. The Supreme Court decision in *Berkemer* compels the same result in this case.

*Swanson*, 341 F.3d at 529. Finally, the purpose and length of the roadside detention were limited. *See Berkemer*, 104 S.Ct. at 3151 (noting that the stopped motorist was never "informed that his detention would not be temporary"). Officer Garland intended to investigate only whether Defendant was impaired. On balance, the factors indicate that custody did not in fact exist until the point of formal arrest.

After considering *Berkemer*, the limited nature of the *Terry*-style detention in this case, and the custody factors, the Court determines that the record does not support Defendant's *Miranda* claim as to any December 22, 2006 statements made prior to formal arrest. Because Defendant was not in custody at that time, *Miranda* does not apply. To the extent that *Miranda* is Defendant's sole basis to suppress, Defendant's motion, relative to the pre-arrest statements, must fail.

C.

Defendant also provided incriminating statements **after** his formal arrest at the traffic stop. The arrest itself conclusively establishes custody. *See Beheler*, 103 S.Ct. at 3520 ("[T]he ultimate inquiry is simply whether there is a *formal arrest* . . . .")(emphasis added). Thus, the United States must show, by a preponderance, that Officer Garland advised Defendant of his rights and secured a knowing, intelligent, and voluntary waiver prior to Defendant's post-arrest statements. *See Miranda*, 86 S.Ct. at 1630; *Burbine*, 106 S.Ct. at 1140-41.

Here, Officer Garland stated that he searched Allen's vehicle after the arrest. *See* Hearing at 11. Garland reportedly located a firearm and drug paraphernalia that appeared to exhibit drug residue. *See id*. at 11-12. According to Garland's undisputed testimony, he returned to the police cruiser, read Defendant his *Miranda* rights, and asked Defendant about the firearm and the substance on the drug paraphernalia. *See id*. at 12-13; *see also id*. at 23-24. Although he initially denied

12

ownership and knowledge of both items, Allen subsequently made incriminating statements. *See id*. at 12, 19-20. Garland reaffirmed that he had provided full *Miranda* warnings before Defendant's post-arrest admissions. *See id*. at 12-13. On this uncontradicted record, the Court credits and accepts Officer Garland's sworn testimony.

At the hearing, Defendant highlighted the fact that Garland failed to secure a written *Miranda* waiver. *See id*. at 18-19. Although a helpful evidentiary device, the United States can satisfy its burden without producing a written waiver. *See United States v. Miggins*, 302 F.3d 384, 397 (6th Cir. 2002)(finding "no authority" for the proposition that a "written waiver is necessary to establish a knowing, intelligent and voluntary waiver of *Miranda* rights").

Because Allen initially denied ownership and knowledge of the contraband, Defendant also suggested that Garland somehow improperly induced the incriminating statements. *See* Hearing at 12, 19-20. Garland himself testified that he could not recall "exactly" what he said that prompted the subsequent admissions, but Garland explained that he "basically" asked Defendant the "same questions" although "reworded." *See id*. at 20.

In view of the circumstances, the Court finds that Defendant's decision to revise his statement is unremarkable. Defendant had already admitted to drug use before his formal arrest. *See id*. at 9. As to the weapon, Garland testified that the butt of the firearm was visible when Defendant exited the car, and that the gun protruded between the driver's seat and console. *See id*. at 10, 15-16. Moreover, Garland located a bullet in Defendant's pocket that was consistent with the firearm in the car. *See id*. at 12. Considering the reality of the situation, it is not surprising that Defendant might rethink his prior denials. This suggests no coercion or overreaching by Garland.

13

In sum, the Court finds that Defendant's impeachment efforts failed to undermine Officer Garland's direct, undisputed, and sworn testimony. The record reflects a valid *Miranda* waiver. Therefore, Defendant's suppression motion, as to the post-arrest December 22, 2006 statements, also fails.

*April 27, 2007 Statements*

Briefly stated, the ATF received a referral from the FBI involving a handgun improperly acquired by Allen. *See id*. at 27-29. The FBI-managed NICS system that monitors such firearm transactions denied the weapon transfer. *See id*. However, the firearm dealer legitimately conveyed the firearm to Defendant based on the sequence and timing of the NICS denial. *See id*. ATF Agents Thomas Chittum and Brad Brasher visited Defendant's residence on April 27, 2007 to investigate the matter and retrieve the handgun.[4] *See id*. at 27, 32.

According to Chittum's testimony, he and Brasher interviewed Allen on the front steps to his residence. *See id*. at 30. Based on the surroundings, Chittum additionally suspected that methamphetamine had been manufactured on the property. *See id*. at 31. Chittum raised the issue and requested consent to search. Defendant denied the accusation and refused consent. He instructed Chittum to obtain a warrant. *See id*. at 31-32.

At that point, Chittum testified that he briefly stepped away from the interview to make a phone call to secure a warrant. *See id*. at 32. Brasher continued to speak with Defendant, who remained unadvised of his *Miranda* rights. *See id*. After only a "couple of minutes," Brasher signaled for Chittum to return. *See id*. at 33-34. Brasher reported that Allen "had changed his mind

---

[4] A Laurel County deputy sheriff also accompanied the ATF agents. *See* Hearing at 30.

and agreed to consent to a search." *See id*. at 33.  Brasher also informed Chittum that Defendant had admitted to prior drug use.  *See id*. at 33-34.  Because Chittum had stepped away, he did not hear Defendant's statements firsthand.[5]  *See id*. at 33.  Brasher himself did not testify.

Chittum acknowledged at the hearing that the agents provided no *Miranda* warning.  *See id*. at 35.  Rather, he explained that no warning was necessary because Defendant was not, at any point, in custody.  *See id*.  The United States argues that any incriminating statements are admissible, at least relative to *Miranda,* on that basis.  *See* DE# 15.  In his supplemental brief, Defendant appears

---

[5]

The record indicates that Defendant "confirmed" to Chittum that he had in fact consented to the search.  *See* Hearing at 33-34.  However, there is no indication that Defendant repeated the admissions, as to drug use, to Chittum.

15

to have conceded the custody issue.[6] *See* DE# 33 at 2-3 ("Considering SA Chittum's description of his encounter with Allen on that date Allen must concede that he was not 'in custody" with respect to his encounter with Chittum."). Regardless, as the footnote discussion reflects, the Court would have found that no custody exists on this record.

Although conceding that the interview was *noncustodial*, Defendant's supplemental brief asserts that the April 27 statements are still inadmissible because the United States failed to establish voluntariness. *See id*. at 3-4. Indeed, confessions and incriminating statements must be voluntary

---

[6]

Allen's custody argument did not focus on the circumstances of the interview itself. Instead, Defendant premised custody on Defendant's home incarceration status, pursuant to a Kentucky state court sentence, at the time of the April 27, 2007 interview. *See* Hearing at 41-42; DE# 33 at 2 ("There should not be any dispute that on April 27, 2007 Allen was in custody, not by virtue of anything said or done by SA Chittum but by virtue of his home incarceration imposed by the state court.").

At least one federal district court has rejected Defendant's home incarceration theory. *See United States v. Cano*, 2007 WL 496704, at *1 (W.D.N.C. Feb. 12, 2007)(holding house arrest and electronic monitoring do not establish custody, *per se*, in the *Miranda* context). The court in *Cano* analogized the house arrest situation to interrogation of an existing prisoner, since the subject's freedom to leave in both cases is similarly restricted. *See id*. at *2. This Court finds the comparison persuasive. Regarding inmates, the Sixth Circuit explains that "*Miranda* warnings need not precede questioning until there has been a restriction of the prisoner's freedom over and above that of his normal prisoner setting." *See United States v. Ozuna*, 170 F.3d 654, 658 n.3 (6th Cir. 1999)(citations omitted).

In applying that standard to this case, the Court finds that the April 27, 2007 interview did not require *Miranda* warnings. According to Chittum's undisputed testimony, Defendant was at all times free to leave or otherwise stop the interview. *See* Hearing at 35-36. Indeed, Chittum stated that Allen, on at least one occasion, went into his residence unaccompanied and closed the door. *See id*. Defendant also revoked his consent to search the residence, which essentially terminated the April 27, 2007 encounter. *See id*. at 35. Plainly, the agents (who evidently were unaware of Allen's punishment status) placed no restrictions on Defendant "over and above" his house arrest conditions. *See Ozuna*, 170 F.3d at 658 n.3. Moreover, the interview at Defendant's residence did not occur in a hostile or coercive environment and was comparatively short–lasting only twenty to thirty minutes. *See* Hearing at 34, 36. Therefore, after accounting for the unique circumstances of the interview, the April 27 incident did not ripen into custody, relative to *Miranda*. Defendant's *Miranda* claim would have certainly failed on that basis.

16

under the Fifth Amendment Due Process Clause, even if *Miranda* does not apply. *See*, *e.g.*, *Beckwith v. United States*, 96 S.Ct. 1612, 1617 (1976)(recognizing that "*noncustodial* interrogation might possibly in some situations, by virtue of some special circumstances . . . bring about confessions not freely self-determined," and explaining that "voluntariness" is the key issue "[w]hen such a claim is raised")(emphasis added).

The due process test for voluntariness examines "whether a defendant's will was overborne." *See Dickerson v. United States*, 120 S.Ct. 2326, 2331 (2000)(citations omitted). The test takes into consideration the "totality of all the surrounding circumstances–both the characteristics of the accused and the details of the interrogation."[7] *See id.* (citations omitted). The United States bears the burden of proving a voluntary confession by a preponderance of the evidence.[8] *See Johnson*, 351 F.3d at 260; *United States v. Wrice*, 954 F.2d 406, 410 (6th Cir. 1992).

Here, Defendant made the incriminating statements to ATF Agent Brad Brasher, who did not testify at the hearing. Agent Chittum acknowledged that he did not hear the incriminating statements firsthand, since he had stepped away from the interview to make a phone call. *See*

---

[7] The Sixth Circuit breaks down the due process test for voluntariness into three queries: i) Was the police activity objectively coercive? ii) Was the coercion in question sufficient to overbear the defendant's will? and iii) Was the alleged police misconduct the crucial motivating factor in the defendant's decision to offer the challenged statement? *See United States v. Johnson*, 351 F.3d 254, 260 (6th Cir. 2003).

[8] To establish voluntariness, Defendant asserts that the United States must show Defendant "knowingly, voluntarily, and intelligently waived his Fifth and Sixth Amendment rights." *See* DE# 33 at 3. That standard, however, applies in the *Miranda* context. Whether Defendant knowingly and intelligently waived his Fifth and Sixth Amendment rights, if otherwise applicable, would be only a *factor* under the due process test. *See Beckwith*, 96 S.Ct. at 1617 ("Proof that some kind of [*Miranda*] warnings were given or that none were given would be relevant evidence only on the issue of whether the questioning was in fact coercive.").

Hearing at 33. Thus, because Brasher did not testify and because Chittum could not competently describe "the nature or tone of the conversation between Brasher and Allen," Defendant argues that the United States effectively failed to meet its burden as to voluntariness. *See* DE# 33 at 3-4.

The Court disagrees. Defendant conceded that the interview was noncustodial, which itself establishes the absence of constitutionally significant coercion or restraint. The Supreme Court very narrowly allowed in *Beckwith* that a "noncustodial interrogation might possibly in some situations, by virtue of some special circumstances" produce an involuntary confession. *See Beckwith*, 96 S.Ct. at 1617. The unlikely scenario identified in *Beckwith* is not at issue in this case.

Even without direct evidence, the record supports a determination that Defendant's "will" was not "overborne." *See Dickerson*, 120 S.Ct. at 2331; *see also Johnson*, 351 F.3d at 260. According to Chittum, the conversation between Defendant and Agent Brasher lasted only a "couple of minutes." *See* Hearing at 33-34. Brasher thus would have had little time to engage in improper tactics, and he would have risked discovery by Chittum, who was nearby and only temporarily absent from the interview. Moreover, Defendant is an adult, he clearly has prior experience in the criminal justice system, and he twice exercised his constitutional right at the April 27 encounter by first refusing and then revoking consent to search. *See id*. at 31-32, 35. Allen also freely and volitionally left the discussion, and went into his home, on at least one occasion. *See id.* at 35-36. Considering the "characteristics of the accused," it seems unlikely that Brasher could have successfully coerced Defendant's consent and statements during Chittum's short absence. *See Dickerson*, 120 S.Ct. at 2331. Finally, the fact that Defendant subsequently revoked his consent

18

strongly suggests that Brasher did not privately apply improper pressure or intimidation. *See* Hearing at 35.

On the basis of these facts, the Court finds that Defendant's statements to Brasher were, in fact, voluntary. The Court perceives no *Miranda* or due process violation as to the April 27, 2007 statements. Defendant's motion to suppress these statements therefore fails.

### III. Recommendation

For all the reasons stated, the Court recommends that the District Court deny the Motion to Suppress filed by the Defendant. *See* DE #12. The District Judge should assign a trial date following final resolution of said motion. *See* DE #23.

The Court directs the parties to 28 U.S.C. § 636(b)(1) for appeal rights concerning this recommendation, issued under subsection (B) of said statute. As defined by § 636(b)(1), Rule 59(b), and local rule, within ten days after being served with a copy of this recommended decision, any party may serve and file written objections to any or all portions for consideration, de novo, by the District Court.

This the 17th day of August, 2007.

Signed By:
*Robert E. Wier* REW
United States Magistrate Judge